**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

_____

|                                                    |     |                      |
|----------------------------------------------------|-----|----------------------|
| **REGINALD BLANCH**                                | )   |                      |
| **1076 Decatur Road**                              | )   |                      |
| **Stafford, VA 22554**                             | )   |                      |
|                                                    | )   |                      |
| **Plaintiff,**                                     | )   |                      |
|                                                    | )   |                      |
| **v.**                                             | )   | **Case No. _____** |
|                                                    | )   |                      |
| **HEXAGON U.S. FEDERAL, INC.**                     | )   | **JURY TRIAL DEMANDED** |
| **301 Cochran Road,**                              | )   |                      |
| **Huntsville, AL 35824**                           | )   |                      |
|                                                    | )   |                      |
| **Defendant,**                                     | )   |                      |
|                                                    | )   |                      |
| **Serve:**                                         | )   |                      |
|                                                    | )   |                      |
| **Corporation Service Company, Inc.**              | )   |                      |
| **641 South Lawrence Street,**                     | )   |                      |
| **Montgomery, AL 36104**                           | )   |                      |

_____)

**CIVIL COMPLAINT FOR EQUITABLE AND
MONETARY RELIEF AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1. Defendant Hexagon U.S. Federal, Inc. (Hexagon), formerly Intergraph Government Solutions, Inc. (IGS), fired Plaintiff Reginald Blanch, a former employee of IGS, because of his disabilities, because he exercised his rights under the Family Medical Leave Act, and because of his race (African-American).

2. Hexagon's actions violated the American with Disabilities Act, the Family Medical Leave Act, and Title VII of the Civil Rights Act of 1964.

3. While employed at Hexagon, Blanch held the position of Information Technology (IT) Lead.

1

4.  Blanch was technically very knowledgeable and proficient, and he was an excellent supervisor and manager.

5.  Blanch was and is a consummate professional skilled at motivating and supporting his team members, and he was dedicated to his work on behalf of Hexagon and its customers.

6.  Blanch has several medical conditions that constitute a "disability" as defined by the ADA.

7.  Blanch has diabetes, colon cancer, and kidney failure, which requires regular dialysis, all of which are medical conditions that substantially limit one or more of his major life activities, including work.

8.  Blanch also underwent a leg amputation and partial hand amputation, both of which substantially limit one or more of his major life activities.

9.  Hexagon had notice of Blanch's disabilities when he submitted a request for medical leave in or around February 2012, in order to have a partial amputation of his leg.

10. Hexagon had additional notice of Blanch's disabilities when he submitted subsequent medical documentation related to his partial-hand amputation due to the lack of blood flow to Blanch's hand.

11. Hexagon also had notice of Blanch's kidney failure, his need for dialysis, and his colon cancer.

12. During his employment with Hexagon (which was then IGS), Hexagon discriminated against Blanch because of his disabilities and retaliated against him because he took medical leave as a reasonable accommodation for his disabilities.

13. During his employment with Hexagon, Hexagon retaliated against Blanch because he exercised his rights under the FMLA.

14. And while Blanch was employed by Hexagon, Hexagon discriminated against him because of his race.

15. Ultimately, Hexagon terminated Blanch because of his disabilities, because of his protected activity under the FMLA, and because of his race – and despite his excellent performance.

16. As a result of Hexagon's unlawful discrimination and retaliation, Blanch has suffered economic and non-economic damages.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, the Americans with Disabilities Act 42 U.S.C. § 12019, *et seq.*, the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

18. Blanch has exhausted the administrative remedies available to him.

19. The Equal Employment Opportunity Commission issued Blanch a Notice of Right to Sue on February 27, 2017.

20. Venue is this district is appropriate pursuant to 28 U.S.C. § 1391 because it is the judicial district where the unlawful employment practices are alleged to have been committed and because Defendant Hexagon may be found in this district.

## PARTIES

21. Plaintiff Reginald Blanch is an African-American man who resides in Stafford, Virginia.

22. Defendant Hexagon is a Delaware corporation.  Hexagon's principal place of

3

business is located at 301 Cochran Road, Huntsville, Alabama 35824.

## FACTUAL ALLEGATIONS

**A. Reginald Blanch had a distinguished 12-year tenure with IGS prior to his termination.**

23. Blanch, who is African-American, began working for Hexagon, then Intergraph Government Solutions, Inc., in 2004.

24. While employed at Hexagon, Blanch held the position of Information Technology (IT) Lead.

25. Blanch received ratings of "Exceeds Expectations" on all of his performance evaluations while at Hexagon.

26. Blanch was technically very knowledgeable and proficient, and he was an excellent supervisor and manager.

27. Blanch was and is a consummate professional skilled at motivating and supporting his team members, and he was dedicated to his work on behalf of Hexagon and its customers.

28. Blanch was contracted to the U.S. Army Records Management and Declassification Agency (RMDA) throughout his tenure with Hexagon.

29. When Blanch began working on the RMDA contract, he was the only Hexagon employee on the contract; Hexagon (IGS) was a subcontractor.

30. Hexagon asked Blanch to grow the contract; Blanch succeeded, growing the contract from one Hexagon employee to 65, including 21 Hexagon employees who reported directly to Blanch.

31. Blanch's excellent work and proven results motivated RMDA to more Hexagon employees and motivated RMDA to place Hexagon in the prime contractor role.

32. As a contractor of RMDA, Blanch consistently received praise from his government clients.

33. RMDA management specifically requested that RMDA award the contract to Hexagon because it wanted Blanch as the IT lead.

34. Hexagon employee Cheryl Hinkle was Blanch's supervisor.

35. Hinkle is Caucasian.

**B.  In or around July 2012, Blanch suffered several serious medical issues.**

36. In July 2012, Blanch discovered an abscess on his heel which required debridements to remove unhealthy tissue caused by an infection.

37. On December 25, 2012, he went into a coma for four days because the antibiotics used to treat the infection made his kidneys fail.

38. Blanch has been on dialysis ever since.

39. Doctors were forced to decrease Blanch's antibiotic dosage because of Blanch's kidney failure.

40. The decreased antibiotics then allowed the original infection to spread to Blanch's leg.

41. On February 14, 2013, doctors amputated Blanch's left leg to stop the infection from spreading further.

42. On November 1, 2013, Blanch was undergoing pre-op procedures for a kidney transplant when doctors discovered that he had colon cancer.

43. Blanch had to indefinitely postpone the kidney transplant to undergo colon resection surgery and chemotherapy.

44. To facilitate dialysis, doctors removed a vein from Blanch's hand and attached it near his kidney.

45. The vein removal caused Blanch's hand to lose significant blood flow.

46. In February 2016, doctors completed a partial hand amputation because the lack of blood flow had caused tissue in Blanch's hand to die.

47. Hexagon had notice of all of these medical conditions.

48. Despite these medical conditions, Blanch consistently performed all of his duties at the highest level.

**C. Hexagon harassed Blanch while he was hospitalized and required Blanch to submit multiple doctors' notes authorizing his return to work.**

49. Blanch took about three weeks of leave in February 2016 related to his partial hand amputation.

50. Hinkle became increasingly concerned about, and resentful of, Blanch's status while he was out on leave.

51. Hinkle frequently emailed Blanch, asking him about his doctor's appointments.

52. After taking three weeks of leave for his partial hand amputation, Blanch worked remotely for about a month.

53. During the course of Blanch's remote work, he had to be hospitalized for a few days to receive antibiotics for an infection in his hand.

54. Hinkle appeared at the hospital, unannounced, and initiated a conference call with Hexagon Human Resources employee Sharon Thigpen.

55. During that call, Thigpen repeatedly pressured Blanch to take short-term disability leave because, according to Thigpen, Blanch needed time to recover.

56. But Blanch was ready and willing to return to work.

57. Blanch told Thigpen that he was ready to return to work, that he did not need short-term disability, and that he would return to work in a few days.

58. Hexagon wanted Blanch to take short-term disability leave because they intended to fire Blanch and having Blanch on disability leave advanced that objective.

59. Thigpen told Blanch that he would need a doctor's note authorizing his return to work.

60. Blanch provided Thigpen a note from Dr. Frederick Scott, the surgeon who operated on Blanch's hand, clearing Blanch to return to work.

61. Despite the fact that Blanch produced the requested note, Thigpen sent a letter to Blanch's infectious disease doctor requesting another note authorizing Blanch's return to work.

62. Blanch's infectious disease doctor showed Blanch the letter from Thigpen and asked why Hexagon had sent it.

63. Blanch told his infectious disease doctor that Dr. Scott had already provided a note authorizing Blanch's return to work and that Blanch did not understand why Hexagon was requesting another note.

64. Blanch's infectious disease doctor provided the requested second note authorizing Blanch's return, even though it should not have been necessary.

65. Blanch returned to work, as he had expected, within a few days; this was in April 2016.

**D. Hinkle, on several occasions, made inappropriate, racially offensive comments to Hexagon employees.**

66. On one occasion prior to Blanch's termination, Gabriel Reyes, who is of Filipino national origin and was then an IGS employee, was having lunch with several other minority employees.

7

67. Hinkle came up and made a comment about Reyes's food, saying that he was eating dogs for lunch.

68. Reyes considered this remark offensive, insensitive and dumb; and he took it as a reference to his Filipino heritage.

69. On another occasion prior to Blanch's termination, Hinkle told Benjamin Hua, an Asian-American, "I got you some green tea," asserting that Hua must like green tea because Hua is Asian-American.

70. Hua considered Hinkle's comment offensive and culturally insensitive.

71. Sangeeta Nayak and Satish Kapoor, two East Indian employees at IGS, experienced discrimination from Hinkle.

72. During an interview of Kapoor for Blanch's former position, Hinkle had some trouble understanding Kapoor due to his accent.

73. After the interview, the group, minus Kapoor, debated whether they should hire him.

74. Hinkle, because of Kapoor's accent, said "Maybe we can bring Sangeeta in to translate."

75. During a different panel interview, Hinkle visibly shook her head at the answers given by the candidate, who was African; at least one other person on the interview panel considered this unprofessional and offensive.

**E. From about 2015 through 2016, Blanch's IT team worked on a Risk Management Framework (RMF) certification and accreditation inspection.**

76. RMDA uses a Risk Management Framework (RMF) to inspect and certify IT platforms and networks.

77. This was the first time RMDA used RMF to evaluate Blanch's team.

78. The RMF certification process is broken down into 3 phases.

79. The first phase is the pre-inspection phase.

80. In the pre-inspection phase, an accreditation team evaluates the network and provides notice of all the findings.

81. The accreditation team then determines what needs to be done to correct the findings.

82. The second phase is where the actual corrections are implemented in preparation of the final phase and evaluation.

83. In the final evaluation phase, the number of findings is important.

84. The government can remove a contractor from RMDA WAR network if there are too many findings in the system.

85. The findings are broken down into Category 1, Category 2, and Category 3.

86. Category 1 denotes the most serious findings.

87. To be considered operational, a system cannot have any Category 1 findings.

88. In or about April 2016, RMDA conducted pre-inspection of the network Blanch managed.

**F. On the first day of RMDA's pre-inspection, Blanch and his team were shocked to learn that the Management Enclave servers would be included as part of the RMF inspection.**

89. On the first day of RMDA's pre-inspection, the RMDA inspection team told Blanch and his team that they needed to include the Management Enclave (ME) as part of the RMF inspection.

90. This was the first time that Blanch's team was told that the ME would be a part of the RMF inspection.

91. "Management Enclave" refers to servers that belong to the system administrators.

92. The Hexagon system administrators are responsible for the upkeep of the ME servers.

9

93. All of the ME servers needed to be upgraded by the system administrators.

94. Blanch and his team could not perform the upgrades because they did not have the right backup software.

95. The inclusion of the ME servers as part of the RMF inspection resulted in a number of findings in the pre-inspection review, including approximately 60 Category 1 findings.

96. RMDA provided its pre-inspection report the week of June 13, 2016.

97. The pre-inspection resulted in 1,069 findings, including 93 Category 1 findings.

98. As noted, 60 of the 93 Category 1 findings were from the ME severs, which were out of the control of Blanch and his team.

99. Approximately 520 findings were based on other things, such as network settings by Fort Belvoir, that Blanch's team could not control.

100. Approximately 178 findings were based on software that Blanch's team did not control.

101. Given these conditions, it did not surprise Blanch or his team that the pre-inspection phase uncovered many findings.

102. Since these findings were in the pre-inspection phase, the findings did not affect the network's certification or accreditation.

103. Instead, the findings represented everything that Blanch and his team needed to fix before the final evaluation.

104. The team, through Blanch's direction, would have been able to fix all the findings.

105. The final evaluation was not scheduled, but it needed to occur by April 2017.

106. Hexagon had hired an Information Assurance (IA) employee, Henry Johnson,

specifically for the RMF certification.

107. The IA lead is charged with identifying and helping to solve the findings; and it was Blanch's team's job to implement the solutions to the findings.

108. RMDA had told Blanch and his team that the pre-inspection phase findings were not an issue if the findings were addressed before the inspection scheduled for March or April of 2017.

109. In the two previous inspection periods, Blanch and his team had far more findings and the end result was never less than successful accreditation.

110. The pre-inspection phase is useful because it allows a company to fix identified issues before the actual inspection is done.

111. Errors found in the pre-inspection phase do not count against the company doing the work, and the pre-inspection findings on the RMF work did not count, or should not have been counted, against Hexagon/IGS.

112. The vast majority of the pre-inspection findings were minor or expected or involved things that Blanch and his team could not control, such as network settings, and did not affect the networks certification or accreditation; and Blanch and his team had plenty of time to correct all of the identified issues.

113. Many of the findings of "vulnerabilities" resulted from the fact that IGS needed to start using Windows 2012 as opposed to Windows 2008.

114. The switch to Windows 2012, in June 2016, eliminated half of the system vulnerabilities that the pre-inspection found.

115. Blanch was not responsible for the RMF system vulnerabilities, and those vulnerabilities were all being properly remedied.

11

116.    The IA lead is charged with identifying and helping to solve the findings; and it was Blanch's team's job to implement the solutions to the findings.

**G. Hexagon fired Blanch, effective June 30, 2016.**

117.    Hexagon terminated Blanch on June 30, 2016, claiming that it was firing him because the pre-evaluation phase uncovered too many findings.

118.    It is unheard of for someone to be fired because of pre-evaluation findings.

119.    By their very nature, pre-evaluation findings are meant as a benchmark from which the network then improves.

120.    In actuality, Hexagon and RMDA decided to terminate Blanch because of his disabilities, his FMLA leave-taking, and his race.

**T. Blanch exhausted his administrative remedies against Hexagon with the Equal Employment Opportunity Commission.**

121.    On January 25, 2017, Blanch filed a charge with the EEOC in which he alleged that Hexagon discriminated against him because of his race and disabilities in violation of Title VII and the ADA.

122.    The EEOC assigned No. 570-2017-00742 to Blanch's charge.

123.    On February 27, 2017, the EEOC issued Blanch a "Notice of Right to Sue" regarding Charge No. 570-2017-00742.

**COUNT I**
**Discrimination**
**Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.***

124.    Blanch hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

125.    At all relevant times to this complaint, Blanch was a "person" and an "employee," and Hexagon was an "employer" and a "covered entity" as defined by the ADA.

126.    Blanch has several medical conditions that constitute a "disability" as defined by 42 U.S.C. § 12102(1)(A).

127.    Blanch's diabetes, colon cancer, and his kidney failure, which requires regular dialysis, are all medical conditions that substantially limit one or more of his major life activities, including work.

128.    Blanch's leg amputation affects his ability to walk, stand, or bend, and is thus a medical condition that substantially limits one or more of his major life activities.

129.    Blanch's partial hand amputation also substantially limits one or more of his major life activities.

130.    Blanch's diabetes substantially limits the major life activity of endocrine function.

131.    Additionally, one of the medicines Blanch is required to take affects his hearing.

132.    Blanch could and did perform all the essential functions of his job with reasonable accommodations for his disabilities, including his ability to take medical leave as needed.

133.    Hexagon had notice of Blanch's disabilities when he submitted a request for medical leave in or around February 2012, in order to have a partial amputation of his leg.

134.    Hexagon had additional notice of Blanch's disabilities when he submitted subsequent medical documentation related to his partial-hand amputation due to the lack of blood flow to Blanch's hand.

135.    Hexagon also had notice of Blanch's kidney failure, his need for dialysis, and his colon cancer.

136.    At the time of Blanch's termination, he was qualified to perform the essential functions of his position.

137.    Blanch's discharge occurred under circumstances that raise a reasonable inference

13

of unlawful discrimination.

138.    Hexagon discriminated against Blanch because of his disabilities and because Blanch took leave as an accommodation for his disabilities.

139.    Hexagon discriminated against Blanch because of his disabilities including, but not limited to, when it subjected Blanch to heightened scrutiny because he took medical leave to accommodate his disabilities.

140.    Hexagon discriminated against Blanch because of his disabilities when its representatives showed up unannounced at the hospital and attempted to force Blanch into taking short-term disability leave, and requiring Blanch unnecessarily to submit multiple doctors' notes authorizing Blanch's return.

141.    Hexagon discriminated against Blanch because of his disabilities when it fired him.

142.    Pursuant to 42 U.S.C. § 12112(a), it is unlawful for a covered entity to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees."

143.    Blanch's purported legitimate business reason for its decision to fire Blanch is pretext for its discrimination in violation of the ADA.

144.    Blanch has been damaged as a result of Hexagon's unlawful acts.

## COUNT II
### Retaliation
### Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

145.    Blanch hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

146.    At all relevant times to this complaint, Hexagon was an "employer" as defined by

14

the ADA.

147.    At all times relevant to this complaint, Blanch was an "employee" as defined by the ADA.

148.    Blanch had a "disability" as defined by 42 U.S.C. § 12102(1)(A) in that his diabetes, colon cancer, leg amputation, partial hand amputation, and kidney failure, which requires regular dialysis, all substantially limited one or more of his major life activities, including work.

149.    Blanch engaged in legally protected activity under the ADA when he requested reasonable accommodations, including medical leave, for his disabilities.

150.    Hexagon was aware that Blanch had disabilities and that he had requested reasonable accommodations, including medical leave, for those disabilities.

151.    At all relevant times to this complaint, Hexagon had a duty under the ADA not to retaliate against Blanch for exercising his rights under the ADA.

152.    Hexagon willfully and intentionally retaliated against Blanch because he exercised his rights under the ADA.

153.    Hexagon violated the ADA when it retaliated against Blanch by firing him.

154.    Blanch was damaged by Hexagon's violation of the ADA.

**COUNT III**
**Retaliation**
**Family and Medical Leave Act of 1993**
**29 U.S.C. § 2601, *et seq.***

155.    Blanch hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

156.    At all relevant times, Hexagon was an "employer" as defined by the FMLA at 29 U.S.C. § 2611(a)(4)(A), as it employed more than fifty employees during more than

twenty workweeks during the previous twelve months.

157.    At all relevant times, Blanch was an "eligible employee" as defined by the FMLA at 29 U.S.C. § 2611(a)(2)(A), as he had been employed by Hexagon, then IGS, for more than twelve months and had performed more than 1,250 hours of service for Hexagon during the previous twelve months.

158.    Blanch had a right under the FMLA, 29 U.S.C. § 2612(a)(1)(D), to twelve workweeks of leave during any twelve month period for a serious health-related condition that made him unable to perform the functions of his position.

159.    Blanch exercised his rights under the FMLA when he took leave in early 2016 because of his partial hand amputation.

160.    At all times, Hexagon had a duty under the FMLA, 29 U.S.C. § 2615(a)(1), not to retaliate against Blanch for exercising his rights under the FMLA.

161.    Hexagon willfully and intentionally retaliated against Blanch, in violation of the FMLA, when it fired him, in part, because he exercised his rights under the FMLA.

162.    Hexagon's purported legitimate business reason for firing Blanch is pretext.

163.    Blanch has been damaged as a result of Hexagon's unlawful acts.

**COUNT IV**
**Race Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.**

164.    Blanch incorporates all allegations set forth in the foregoing paragraphs as though fully alleged herein.

165.    Blanch was an "employee" as defined by 42 U.S.C. § 2000e.

166.    Hexagon is an "employer" as defined by 42 U.S.C. § 2000e.

167.    Title VII makes it unlawful for an employer "to discharge any individual, or

16

otherwise discriminate against individuals with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1).

168.   Blanch is an African-American and falls within a class of persons protected under Title VII.

169.   Hexagon's purported reason for firing Blanch was pretext for race discrimination.

170.   Blanch was performing his job excellently, and was the only person terminated because of, purportedly, the pre-evaluation findings.

171.   Blanch's discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

172.   Hexagon, through Hinkle and others, discriminated against Blanch because of his race when it fired him.

173.   Hexagon took an adverse action against Blanch because of his race when it terminated him effective June 30, 2016.

174.   As a result of Hexagon's unlawful discrimination against Blanch based on his race, Blanch has suffered economic and emotional distress damages.

## PRAYER FOR RELIEF

Based on the foregoing allegations of unlawful discrimination and retaliation, Plaintiff Reginald Blanch respectfully requests that this Court award him the following relief:

175.   Immediate reinstatement and immediate abatement of Hexagon's unlawful conduct toward him, or alternatively, front pay;

176.   Economic damages for lost wages as a result of Hexagon's unlawful discrimination and retaliation;

17

177.    Compensatory (non-economic) damages, including damages for emotional distress and loss of reputation;

178.    Punitive damages to punish Hexagon for its malicious acts of discrimination and retaliation against Blanch and to deter Hexagon from similar discriminatory and retaliatory conduct toward other employees;

179.    Liquidated damages equal to Blanch's back pay;

180.    Injunctive or other equitable relief, as this Court may deem appropriate;

181.    Reasonable litigation costs, including reasonable attorney's fees; and

182.    Any other just and equitable relief this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Reginald Blanch demands a trial by jury for any and all issues proper to so be tried.


Dated:  May 26, 2017                                  Respectfully submitted,



                                                      /s/ John T. Harrington
                                                      R. Scott Oswald, DC Bar # 458859
                                                      John T. Harrington, DC Bar # 987659
                                                      The Employment Law Group, P.C.
                                                      888 17th Street, N.W., 9th floor
                                                      Washington, D.C. 20006
                                                      (202) 261-2806
                                                      (202) 261-2835 (facsimile)
                                                      soswald@employmentlawgroup.com
                                                      tharrington@employmentlawgroup.com
                                                      *Counsel for Plaintiff Reginald Blanch*