# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

REGINALD BLANCH,
     **Plaintiff,**

     **v.**                           **Civil No. 1:17-cv-613**

HEXAGON US FEDERAL, INC.,
     **Defendant.**

## MEMORANDUM OPINION

Plaintiff Reginald Blanch, who has diabetes, colon cancer, vision problems, hearing difficulties and kidney failure and has undergone a leg amputation and partial hand amputation, was terminated by Defendant Hexagon US Federal, Inc. ("Hexagon") after twelve years of employment.[1] Blanch alleges his termination was the result of disability discrimination and retaliation in violation of the employment provisions of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12117, 12203, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654. Hexagon, however, contends that Blanch was terminated because an audit of the Information Technology ("IT") systems Blanch managed revealed severe and extensive vulnerabilities.

At issue is whether Hexagon is entitled to summary judgment on the basis of the undisputed factual record. Also at issue is whether Blanch is entitled to partial summary judgment, on the basis of the undisputed factual record, regarding Hexagon's affirmative defense that Blanch's claims are barred, in whole or in part, by the applicable statutes of limitations. The

---

[1] Hexagon was formerly known as Intergraph Corporation and Intergraph Government Solutions, Inc. Both parties agree the names are interchangeable and reference defendant. Def.'s Mem. 3 n1; see Second Am. Compl. ¶ 1. Accordingly, for clarity, this Memorandum Opinion will use "Hexagon" to refer to defendant even when referring to periods during which it was known by a different name.

parties have fully briefed and argued the issues, and they are now ripe for disposition. For the reasons set forth herein, Hexagon's motion must be granted and, given this, Blanch's motion is not addressed.

## I.

Summary judgment is appropriate only where there are no genuine disputes of material fact, Fed. R. Civ. P. 56. Accordingly, the record facts as to which no genuine dispute exists must first be identified. To this end, Local Rule 56(B) directs a movant for summary judgment to include a section listing, in numbered-paragraph form, all material facts as to which the movant contends no genuine dispute exists. This mandate was also set out in an earlier Order in this case. *Reginald Blanch v. Hexagon US Federal, Inc.,* No. 1:17-cv-613 (E.D. Va. Jan. 17, 2018) (Order). The nonmovant must then respond, also in numbered-paragraph form, to each numbered paragraph, either admitting or contesting the putative undisputed fact and citing admissible record evidence to establish a genuine dispute of material fact. Pursuant to an earlier Order issued in this case, the nonmovant's failure to respond in this manner to a fact listed by the movant constitutes an admission that the listed fact is undisputed for the purpose of deciding the motions for summary judgment. *Id.* Hexagon has fully complied with this Local Rule and Order. Blanch, however, has only partially complied. Blanch's Opposition to Defendant's Motion for Summary Judgment admits or denies each of Hexagon's putative undisputed facts. Yet Blanch fails to do so in numbered-paragraph form. And, in an action that belies judicial economy, Blanch fails to cite admissible record evidence supporting his objections to Hexagon's putative undisputed facts. Instead, Blanch proffers his own "Statement of Additional Undisputed Facts" and a chart of "Disputed Material Facts."[2] This clear violation of the Local Rule and Order is

---

[2] The record evidence cited in support of Blanch's "Statement of Additional Undisputed Facts" and "Disputed Material Facts" fails to compensate for Blanch's failure to follow the Local Rule and Order. Blanch's "Statement of

grounds for striking Blanch's Opposition and deeming Hexagon's putative undisputed facts admitted.[3] In any event, an exhaustive review of the parties' respective putative undisputed facts and supporting evidence has been undertaken to identify the facts about which there is no genuine dispute supported by admissible record evidence. That review revealed the following undisputed facts:

- Plaintiff Reginald Blanch was hired by Hexagon in 2004.

- Blanch suffers, or has suffered, from numerous medical conditions, including diabetes, vision problems, kidney problems, hearing problems, a partial amputation of his left leg (below the knee), colon cancer and a partial amputation of his left hand (two fingers).

- In January 2013, in response to Blanch's request and to accommodate Blanch's poor vision, Hexagon provided Blanch software that would assist him in reading his computer screen.

- Blanch requested medical leave beginning in August 2012 and continuing off and on through February 2013 due to an abscess that developed in his left heel and ultimately resulted in a partial amputation of his left leg. Hexagon approved Blanch's requests.

- In late 2013, Blanch requested and received leave from Hexagon to have surgery related to his colon cancer. Blanch also requested, and received from Hexagon, leave once every couple of weeks for a period of six months to attend chemotherapy appointments.

- Hexagon allowed Blanch to work from home the week of February 8, 2016 and part of the week of February 15, 2016 because Blanch was ill following his partial hand amputation.

- In mid-February 2016, following medical complications and surgeries related to Blanch's hand, Sharon Thigpen, Hexagon's Human Resources Specialist, encouraged Blanch to take a week of leave to rest and recover. Thigpen also encouraged Blanch to work from home as long as necessary thereafter. Blanch worked from home for the remainder of February 2016, the entire month of March 2016 and into early April 2016.

- On April 5, 2016, Blanch was hospitalized due to an infection in his hand. Cheryl Hinkle, Blanch's immediate supervisor, visited Blanch in the hospital. While there, Hinkle gave Blanch paperwork regarding short-term disability and other benefits available to him. Hinkle had visited Blanch in the hospital on several prior occasions, and Blanch had never complained to Hexagon about Hinkle's hospital visits.

---

Additional Undisputed Facts" does not reference Hexagon's undisputed facts or identify any disputes Blanch has with those facts. And Blanch's chart purporting to compare Blanch's "Disputed Material Facts" with Hexagon's undisputed facts merely groups the parties' respective undisputed facts into categories; nowhere does Blanch specifically respond to each of Hexagon's undisputed facts that he disputes with citations to admissible record evidence.

[3] Indeed, Blanch has committed a further violation of the Local Rules. Pursuant to Local Rule 7(F)(3), all briefs are required to be double-spaced. Yet approximately fourteen pages of Blanch's brief are single-spaced. *See* Pl.'s Opp'n 3–17.

- Hexagon requested, in accordance with its standard policy, that Blanch provide a note from his doctor clearing him to return to work and identifying any restrictions on his ability to do so. On April 11, 2016, Hexagon received a note from Dr. Frederick Scott, an orthopedic surgeon, stating that Blanch was authorized for "light duty," could work from home the week of April 11, 2016 and could return to work on-site on Mondays, Wednesdays and Fridays the weeks of April 18, 2016 and April 25, 2016.

- Also on April 11, 2016, Thigpen requested clarification from Dr. Scott regarding the note. The following day, Thigpen, who had not heard back from Dr. Scott, reached out to Dr. Stephen Weinroth, one of Blanch's physicians, requesting that Dr. Weinroth provide information regarding Blanch's ability to return to work. On or around April 13, 2016, Thigpen received a second note from Dr. Scott answering the questions she had posed to him regarding Blanch's return to work. Dr. Weinroth never responded to Thigpen's April 12, 2016 note, and Thigpen did not seek any more information from Dr. Weinroth.

- In accordance with the information Hexagon received from Dr. Scott, Hexagon cleared Blanch to return to work partially from home and partially on-site. Blanch continued to work partially from home and partially on-site through the middle of May 2016.

- On May 17, 2016, Blanch resumed working on-site fulltime.

- Hexagon never denied any of Blanch's requests for medical leave or any other request for accommodation relating to Blanch's medical conditions.

- Hexagon has a contract ("the RMDA contract") with the U.S. Army Records Management & Declassification Agency ("RMDA") to provide IT services and support for RMDA. Specifically, Hexagon provides services and support for RMDA's IT system, known as the Army Records Information Management System ("ARIMS").

- For most of Blanch's employment with Hexagon, including at the time of his termination, Blanch served as IT lead on the RMDA contract and was responsible for supervising 18–21 employees who performed IT-related services. Blanch worked on-site at RMDA.

- As of October 2013, Blanch's immediate supervisor was Hinkle, Hexagon's Technical Director and the program manager for the RMDA contract. Beginning in February 2016, Blanch's second-level manager was Willie McFadden, then Hexagon's Executive Director for Army and Department of Defense Programming. From January 2015 through Blanch's termination, Wendell Taylor served as RMDA's Chief Information Management Officer and was responsible for overseeing all IT services and support at RMDA.

- In 2015, the Department of the Army adopted a Risk Management Framework (RMF) process to review, audit, accredit and monitor the security of its IT system. This new process replaced the prior accreditation system known as the Department of Defense Information Assurance Certification and Accreditation Process ("DIACAP"). Neither McFadden, Hinkle nor Taylor were involved in RMDA's prior accreditation processes using DIACAP.

- The RMF process is broken down into six phases: (i) categorization of the IT system and the information it processes, stores and transmits; (ii) selection of a set of baseline security controls; (iii) implementation of the security controls and documentation of how they are deployed; (iv) assessment of the controls to determine whether they are implemented

correctly, operating as intended and meeting the security requirements; (v) authorizing system operation and (vi) monitoring and assessing the security controls on an ongoing basis.

- For the fourth stage of the process, the assessment, RMDA arranged for a pre-validation, which identifies problems and vulnerabilities in the IT system prior to the final assessment.

- Blanch was responsible for the standards and controls for the IT system audited during the RMF process. RMDA and Hexagon expected Blanch to implement the controls necessary to comply with RMF requirements and to assist in drafting and reviewing documents relating to technical aspects of certain security controls.

- Prior to the pre-validation (beginning in late 2015 or early 2016), RMDA and Hexagon conducted a self-assessment of RMDA's IT systems and related policies and protocols to prepare for the pre-validation.

- For several months leading up to the pre-validation, Blanch met weekly with Taylor and Henry Johnson, the member of Blanch's team responsible for determining which controls were necessary to comply with RMF.[4]

- During this time, Blanch assured Taylor and Hinkle that he and his team had things under control and that RMDA was in a good position going into the pre-validation. Yet during an April 2016 status meeting about RMF, RMDA leadership realized that much of the documentation required for RMF was not in place.[5] Hinkle and Tony Thomas, another

---

[4] Blanch disputes this fact "to the extent that it purports to show that Henry Johnson was only responsible for *determining* which RMF controls applied to ARIMS and were needed for compliance with RMF." Pl.'s Opp'n 8 (emphasis in original). Yet this fails to create a genuine dispute of material fact. Blanch does not cite any record evidence to support his assertion. Moreover, Hexagon does not contend that Johnson was *only* responsible for determining which controls were necessary to comply with RMF. To the extent Blanch disputes this fact because he elsewhere contends that "[w]hile Blanch was hospitalized, Johnson was responsible for drafting RMF documentation," this too fails to create a genuine dispute of material fact for the reasons described in footnote 5. *Id.* at 7.

[5] Blanch contends that he "drafted everything that [he] was supposed to draft," yet Hexagon maintains that "not all of the RMF-related documentation had been properly updated to reflect the current environment, another item that fell at least in part within Blanch's responsibility." Pl.'s Opp'n 7; Def.'s Mem. 8. This disagreement fails to create a genuine dispute of material fact because the contemporaneous record evidence supports Hexagon's position; Blanch's argument is supported only by his own self-serving testimony. *See Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 962 (4th Cir. 1996) ("we generally consider self-serving opinions without objective corroboration not significantly probative"). Specifically, Hinkle sent an email to Blanch on May 25, 2016, several weeks before the pre-validation, admonishing him for failing to complete RMF documentation. Hinkle's email to Blanch said, in relevant part:

> [W]e had discussed on 20 May 2016, how critical the RMF documentation is for this project. On the ECCB chart, there was a start date of 1 October 2015 and completion date of 1 March 2016 with team Henry/[ Blanch]. . . . In April 2016, IMO requested that Tony [Thomas] attend a RMF status meeting and it was clear that we did not have the necessary RMF documentation in place. . . .

> Currently, there are 8 outstanding documents in Technical Review (submitted to you 27 April 2016 to 19 May 2016). . . . Over the past month, you indicated that you would return a particular document back to me either today or tomorrow, but that has not been the case. You have not completed your reviews in a timely manner to meet customer mission with an impending assessment team arriving onsite (6 June 2016) for the pre evaluation of RMF documentation.

Hexagon employee, stepped in to draft RMF-related documents in an effort to complete everything in time for the pre-validation.

- An outside auditing team conducted the RMF pre-validation the week of June 13, 2016. The pre-validation revealed 1,052 findings, or vulnerabilities, in the system. Specifically, there were 93 Category I findings (the most severe), 789 Category II findings and 170 Category III findings (the least severe). To be deemed operable, a network is not permitted to have any Category I findings.

- Hundreds of these findings were within Blanch's control.[6] Hexagon believed these findings could have been mitigated had Blanch done more to prepare for the pre-validation.[7]

- Although both Hexagon and RMDA leadership anticipated some findings, they were shocked by the extent and severity of the findings. RMDA was extremely displeased with the findings and expressed its dissatisfaction with the RMF pre-validation results to Hexagon leadership. Hexagon was dismayed by the findings and believed the findings demonstrated a failure to perform its basic responsibilities as a provider of IT support to RMDA.[8]

---

Your current performance is clearly below standards of your position. It is imperative that you reassess your priorities and complete all documentation assigned to you or reassign them. . . .

Def.'s Ex. 13. Given this contemporaneous evidence, Blanch's uncorroborated deposition testimony is hardly compelling. Yet even assuming a genuine dispute of fact, the dispute is not material. That Blanch may not have been responsible for drafting the documents to prepare for the RMF pre-validation does not undermine the legitimacy of Hexagon's asserted legitimate nondiscriminatory justification for terminating Blanch, namely that Blanch, as the IT Lead, was responsible for the IT system that was shown by the RMF pre-validation to have extensive and severe vulnerabilities which, in Hexagon's view, undermined Hexagon's chances of winning the upcoming contract recompete and necessitated a change in IT leadership to show RMDA that Hexagon had a strong plan for addressing the findings quickly and effectively. Dep. Blanch 201:14–203:7, 236:3–237:17; Dep. McFadden 61:11–22, 63:8–14, 65:22–66:4.

[6] Blanch contends that "[o]nly about 200 of the findings were within Blanch's control." Pl.'s Opp'n 9. Hexagon does not identify with specificity the number of findings it believes Blanch was responsible for. Accordingly, Hexagon's contention that "hundreds" of findings were within Blanch's control is consistent with Blanch's admission that he had control over "about 200" findings, and thus no genuine dispute of material fact exists.

[7] Blanch disputes this fact "to the extent that it asserts Hexagon legitimately 'believed these findings could have been mitigated had Blanch done more to prepare for the pre-validation." Pl.'s Opp'n 2. Yet Blanch fails to cite any record evidence to support his position in a way that complies with Local Rule 56(B). Moreover, even scouring Blanch's list of "Disputed Material Facts" does not reveal a genuine dispute of material fact. Nowhere does Blanch argue, with citation to admissible record evidence, that the approximately 200 findings that were within his control could not have been mitigated. Nor does Blanch argue, as is actually at issue, that Hexagon did not *legitimately believe* Blanch could have taken steps to mitigate the findings that were within his control. Indeed, Blanch methodically explains why hundreds of findings were beyond his control but, having admitted that "about 200" findings *were* within his control, fails to argue that he could not have taken steps that would have mitigated these findings. *See* Pl.'s Opp'n 7–10.

[8] Blanch disputes these facts "to the extent that they assert that Hexagon and RMDA had a legitimate basis to be 'shocked' [by], 'displeased' [with] or 'dismayed' by the preliminary findings." Pl.'s Opp'n 2. This fails to create a material dispute because whether Hexagon and RMDA had a legitimate basis for their shock and dismay is immaterial. Under the burden shifting framework from *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applicable to Blanch's discrimination and retaliation claims, it is the genuineness of the employer's proffered justification that is material, not the accuracy of that justification. *See Giannopoulous v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (4th Cir. 1997) ("the pertinent question is not whether [the employer] was right . . . but

- On June 30, 2016, McFadden terminated Blanch. During the conversation, McFadden said that Blanch was being terminated because of the number of pre-validation findings.

Blanch brought this action on May 5, 2017. On November 9, 2017, Blanch filed a Second Amended Complaint, asserting claims of (i) discriminatory discharge in violation of the ADA, (ii) retaliation in violation of the ADA, (iii) retaliation in violation of the FMLA and (iv) race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*[9] Hexagon answered Blanch's Second Amended Complaint on January 26, 2018, asserting a number of affirmative defenses. Blanch moved for summary judgment on April 30, 2018 with respect to Hexagon's affirmative defense that Blanch's claims are barred, in whole or in part, by the applicable statute of limitations. Shortly thereafter, Hexagon moved for summary judgment on all four of Blanch's claims. By Order dated June 15, 2018, Hexagon and RMDA jointly stipulated to dismissal of Blanch's Title VII claim. *Blanch v. Hexagon US Federal, Inc.,* No. 1:17-cv-613 (E.D. Va. June 15, 2018) (Order). Accordingly, this Order does not address the parties' arguments in their briefs relating to that count and is instead exclusively concerned with the three remaining counts.

## II.

The summary judgment standard is well settled. In essence, summary judgment is appropriate under Rule 56, Fed. R. Civ. P., only where "the movant shows that there is no

---

whether [its] belief that this was so was genuine or whether this rationale is merely a pretext for . . . discrimination"). Accordingly, Blanch's contention that Hexagon and RMDA lacked a legitimate basis for their reaction to the pre-validation findings, even if true, does not undermine Hexagon's account of that reaction. Indeed, Blanch himself does not dispute that Hexagon and RMDA were shocked by, displeased with and dismayed by the findings. To the contrary, Blanch admits that RMDA's director was upset about the findings and did not talk to Blanch about them because he was "too busy screaming about the findings." Dep. Blanch 251:4–10. And Blanch admits that Hexagon "[o]bviously" thought there were too many findings and was upset about them. *Id.* at 271:1–272:8. Accordingly, Blanch fails to raise a genuine dispute of material fact.

[9] Blanch also brought claims against RMDA, but they were dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P. *Blanch v. Hexagon*, No. 1:17-cv-613 (E.D. Va. Jan. 12, 2018) (Order).

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, courts must "view the facts and draw all reasonable inferences in the light most favorable to the non-moving party." *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). Importantly, however, the non-movant may not rely on "mere allegations." *Id.* (citation omitted). Instead, the non-movant "must set forth specific facts that go beyond the mere existence of a scintilla of evidence." *Id.* (internal quotation marks and citations omitted). Given these principles, it is clear the material facts supporting summary judgment are undisputed.

## III.

The three remaining claims on which Hexagon argues it is entitled to summary judgment are (i) discriminatory discharge in violation of the ADA, (ii) retaliation in violation of the ADA and (iii) retaliation in violation of the FMLA. Each of these claims is addressed in turn.

## A.

The principles governing Blanch's discriminatory discharge claim are clear and settled. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge." 42 U.S.C. §12112(a). When a plaintiff does not proffer direct evidence of discriminatory discharge, he may prove his claim through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015). Both parties agree Blanch has not proffered direct evidence of discriminatory discharge and thus the *McDonnell Douglas* framework applies.

It is well established that "[u]nder the *McDonnell Douglas* proof scheme, the plaintiff has

the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). "In an ADA wrongful discharge case [such as this], a plaintiff establishes a *prima facie* case if he demonstrates that (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of this discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin North America*, 252 F.3d 696, 706 (4th Cir. 2001). If plaintiff makes this showing, the burden then shifts to defendant to provide a legitimate, nondiscriminatory justification for the discharge. *Ennis*, 53 F.3d at 58. Upon defendant articulating such a justification, the burden shifts back to plaintiff to prove defendant's proffered justification is pretextual. *Jacobs*, 780 F.3d at 575–76. Plaintiff may do this by showing the purported justification is false or "unworthy of credence." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005).[10] Importantly, plaintiff may not "seek to expose [defendant's] rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). Rather, to survive a motion for summary judgment, "plaintiff must produce sufficient evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude the adverse employment action was taken for an impermissible reason." *Sharif v. United Airlines*, 841 F.3d 199, 203 (4th Cir. 2016).

With respect to Blanch's *prima facie* case, the parties agree that Blanch was discharged

---

[10] Although a Title VII case, *Anderson*, and the other Title VII cases cited herein, is applicable to Blanch's claims because "courts have routinely used Title VII precedent in ADA cases." *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001).

by Hexagon. Def.'s Mem. 21. And Hexagon assumes for purposes of summary judgment that Blanch was a qualified individual under the ADA at the time of his discharge. *Id.* Accordingly, Blanch has satisfied the first and second elements of a *prima facie* case of discriminatory discharge. At issue is whether Blanch has satisfied the third and fourth elements, namely whether Blanch was performing his job at a level that met Hexagon's legitimate expectations at the time of his discharge and whether Blanch's discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

Although the Fourth Circuit has indicated, in the Title VII context, "that the burden of establishing a *prima facie* case [of discrimination] is not a heavy one," there is nonetheless reason to question whether Blanch has satisfied it here. *Young v. Lehman*, 748 F.2d 194, 197 (4th Cir. 1984). However, even assuming Blanch has satisfied this burden, his discriminatory discharge claim ultimately fails because Blanch cannot establish that Hexagon's legitimate, nondiscriminatory reason for discharging him is pretextual.

Hexagon argues Blanch does not satisfy the third element of a *prima facie* case for discriminatory discharge, namely that Blanch was performing his job at a level that met Hexagon's legitimate expectations at the time of his discharge. The record reflects that Blanch was not.

Hexagon argues the severe and extensive vulnerabilities in RMDA's IT system discovered during the pre-validation establish that Blanch was not performing his role of IT Lead at a satisfactory level. As Hexagon points out, the pre-validation results were important to both Hexagon and RMDA. Indeed, RMDA and Hexagon began preparing for the pre-validation many months before the mid-June 2016 pre-validation. Dep. Taylor 120:3–9. And in the months leading up to the pre-validation, Taylor, Blanch and Johnson had weekly meetings to discuss the

status of Hexagon's work in preparing for the pre-validation. Dep. Taylor 168:16–22. When, despite this attention and preparation, the pre-validation revealed over 1,000 findings, Hexagon leadership was shocked and concerned. Dep. McFadden 60:7–11; Dep. Taylor 133:22–134:9; Dep. Hinkle 148:6–11. Indeed, Blanch confirms Hexagon "[o]bviously" thought there were too many findings and was upset about them. *Id.* at 271:1–272:8. Importantly, Hexagon believed that hundreds of the findings could have been mitigated had Blanch done his job properly prior to the pre-validation. Dep. McFadden 63:20–64:5. Blanch spills considerable ink arguing that many of the findings were out of his control. Yet, Blanch admits that about 200 findings were within his control. And nowhere does Blanch argue that he lacked the ability to mitigate these approximately 200 findings. More fundamentally, it is Hexagon's opinion of Blanch's performance, not Blanch's own opinion, that is relevant to establishing a *prima facie* case of discriminatory discharge. *See Haulbrook v. Michelin North America,* 252 F.3d 696, 706 (4th Cir. 2001) (noting the third element of a *prima facie* case of discriminatory discharge under the ADA is that "at the time of this discharge, [plaintiff] was performing the job at a level that met *his employer's legitimate expectations*") (emphasis added). Although Hexagon's expectations must be legitimate, Blanch has not contested the sincerity or accuracy of Hexagon's belief that the approximately 200 findings Blanch admits were within his control could have been mitigated had Blanch performed his job at a satisfactory level.

Hexagon does not rely solely on the significant number of pre-validation findings to establish that Blanch was failing to perform his job to Hexagon's satisfaction at the time of his discharge. To this end, Hexagon proffers an email Hinkle sent to Blanch on May 25, 2016, several weeks before the pre-validation and approximately one month before Blanch was fired, admonishing Blanch for his substandard performance in failing to complete necessary pre-

validation documentation:

> [W]e had discussed on 20 May 2016, how critical the RMF documentation is for
> this project. On the ECCB chart, there was a start date of 1 October 2015 and
> completion date of 1 March 2016 with team Henry/[ Blanch]. . . . In April 2016,
> IMO requested that Tony [Thomas] attend a RMF status meeting and it was clear
> that we did not have the necessary RMF documentation in place. . . . .

> Currently, there are 8 outstanding documents in Technical Review (submitted to
> you 27 April 2016 to 19 May 2016). . . . Over the past month, you indicated that
> you would return a particular document back to me either today or tomorrow, but
> that has not been the case. You have not completed your reviews in a timely
> manner to meet customer mission with an impending assessment team arriving
> onsite (6 June 2016) for the pre evaluation of RMF documentation.

> Your current performance is clearly below standards of your position. It is
> imperative that you reassess your priorities and complete all documentation
> assigned to you or reassign them. . . .

Def.'s Ex. 13. It is difficult to take seriously Blanch's contention that he was performing at a

satisfactory level at the time of his termination considering that his immediate supervisor stated

clearly in an email one month prior to his termination that, "Your current performance is clearly

below standards of your position." *Id.*

Despite this evidence, Blanch argues that he was meeting Hexagon's legitimate

expectations at the time of his termination. Perhaps recognizing the strength of Hexagon's

position, Blanch first contends the pre-validation findings cannot be considered in this inquiry. In

support of his argument, Blanch cites a Western District of North Carolina case in which the

district court concluded it was inappropriate to consider the "single event" that constituted the

employer's justification for terminating the plaintiff when determining whether the plaintiff had

met his employer's legitimate expectations and thus established a *prima facie* case of

discrimination. *Stephens v. Neal's Pallet Co.*, No. 3:11-cv-173, 2012 WL 2994651 (W.D.N.C.

July 23, 2012). Yet, the Fourth Circuit in *Warch* considered and rejected adopting a requirement

that courts assess only "whether an employee met [his] employer's legitimate expectations *prior*

to the event(s) that sparked the termination." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 516

(4th Cir. 2006) (citation omitted) (emphasis in original). Specifically, the Fourth Circuit concluded that this requirement is "unworkable, especially when there is no one 'event' that 'sparked the termination,' but instead a long string of performance problems leading up to [the] firing." *Id.* Blanch makes much of the latter half of this conclusion. Yet the Fourth Court noted considering only the employee's performance prior to the event(s) triggering termination is unworkable *especially* when there is not a single event precipitating the termination, not that the approach is unworkable *only* in such cases. Indeed, numerous district court cases in the Fourth Circuit have concluded the employee was not meeting his employer's legitimate expectations for purposes of establishing a *prima facie* case of discrimination after relying on the single event triggering termination as evidence.[11] Moreover, the *Stephens* case Blanch relies on is inapposite here because the vulnerabilities discovered during the pre-validation findings cannot be accurately characterized as a single event. Although the IT system's vulnerabilities were discovered during a single event (i.e., the pre-validation), the vulnerabilities were not the result of a single incident, but rather months—perhaps years—of action or failure to act.

Blanch next argues that his "excellent work and proven results over a number of years had motivated RMDA to hire more Hexagon employees and to place Hexagon in the prime contractor role" on the RMDA contract. Pl.'s Opp'n 24. Yet, Blanch fails to cite any evidence other than his own uncorroborated testimony, which the Fourth Circuit views as carrying little weight, to support his claim. In affirming summary judgment, the Fourth Circuit noted, "we generally consider self-serving opinions without objective corroboration not significantly

---

[11] *See, e.g., Harris v. Bank of Delmarva*, No. MJG-13-2999, 2015 WL 501970, at *5 (D. Md. Feb. 4, 2015) (plaintiff was not meeting her employer's expectations at the time of her termination because she used a racial slur at work); *Palmer v. E.F. Thompson, Inc.*, No. 2:10-cv-51, 2012 WL 253104 (E.D. Va. Jan. 26, 2012) (relying on plaintiff's "involve[ment] in a catastrophic accident while driving for Defendant" in finding plaintiff failed to establish he was meeting his employer's legitimate expectations).

probative." *Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 962 (4th Cir. 1996).

Moreover, Hexagon was put in the prime contractor role on the RMDA contract in 2004 or 2005,

eleven to twelve years prior to Blanch's termination. Dep. Hinkle 24:17–25:6. Even assuming

the truth of Blanch's self-serving testimony that he is responsible for Hexagon acquiring the

prime contractor role, which has not been confirmed by anyone at RMDA or Hexagon, this much

earlier success cannot plausibly be a basis for showing Blanch was meeting Hexagon's

legitimate expectations over a decade later. As the Fourth Circuit has noted, "it [is] important to

hold employee-claimants in discharge . . . cases to the burden of showing that performance at the

requisite level of employer expectations continued to a time reasonably close to the time of the

challenged employer action." *Lovelace v. Sherwin-Williams Co.,* 681 F.2d 230, 244 (4th Cir.

1982).

Blanch next argues that his positive performance reviews establish that he was

performing his job at a level that met Hexagon's legitimate expectations at the time of his

discharge. Specifically, Blanch points to his 3.88 score on a scale from 1.0 to 5.0 on both his

September 2014 and July 2015 performance evaluations. Def.'s Ex. 13; Def.'s Ex. 12. A score of

3.0 means "Meets Expectations," and a score of 4.0 means "Exceeds Expectations." *Id.* Contrary

to Blanch's arguments, this does not create a triable issue of fact because what is relevant is how

Blanch performed in June 2016, not how he performed eleven and twenty-one months prior to

his termination. As the Fourth Circuit has noted, this earlier performance is irrelevant.

Specifically, the Fourth Circuit held that a 1990 performance evaluation assessing an employee's

performance in the latter part of 1989 was "irrelevant because [the employee] was not

performing well in August of 1990, the time of termination." *O'Connor v. Consol. Coin Caterers

Corp.,* 56 F.3d 542, 547 (4th Cir. 1995), *rev'd on other grounds,* 517 U.S. 308 (1996). The

performance evaluations Blanch relies on assessed his performance eleven and twenty-one months prior to his termination; the performance evaluation rejected as irrelevant by the Fourth Circuit in *O'Connor* reviewed the plaintiff's performance eight months prior to his termination.

Blanch also argues the fact that Hexagon did not put him on a performance improvement plan (PIP) indicates that he was meeting Hexagon's legitimate expectations at the time of his termination. Yet Marilyn Parker, Hexagon's corporate designee, testified that although Hexagon "utilize[s] employee disciplinary notices, . . . there are things, depending upon the issue, that may not require disciplinary notice . . . we certainly don't have to have prior notices, warnings, or disciplinary notices to terminate someone." Dep. Parker 55:20–56:5. As such, although Blanch's lack of history with performance improvement plans is consistent with the conclusion that he was meeting Hexagon's legitimate expectations, it certainly does not compel this conclusion. Indeed, that Blanch was given clear written notice that his "performance [was] clearly below [the] standards of [his] position" approximately one month before his termination is significantly more probative than the absence of a formal performance improvement plan, which Hexagon confirms it does not always utilize when employees are underperforming. Def.'s Ex. 13; Dep. Parker 55:20–56:5.

Finally, Blanch argues that the pre-inspection findings were not an indication that he was failing to perform his job to Hexagon's legitimate satisfaction. Specifically, he contends that (i) results during the pre-validation phase are "nothing negative" against the contractor performing the work, (ii) Hexagon had a greater number of findings in its 2013 audit under DIACAP than the 2016 audit under RMF at issue, (iii) RMDA told Blanch's team that the pre-validation findings were not an issue provided they were addressed before the final inspection, (iv) the vast majority of findings were minor or expected or involved things Blanch's team could not control

and (v) there was plenty of time to correct all of the IT system's vulnerabilities. Yet these assertions suffer from a number of deficiencies and fail to create a genuine dispute of material fact.

First, Blanch contends that pre-validation results do not count and "there's nothing negative against you" during the pre-validation phase. Dep. Blanch 200:4–5. Yet Blanch fails to identify the source of his belief or identify evidence that otherwise establishes the countless pre-validation findings would not negatively impact Hexagon. Indeed, when Blanch was asked how he knew pre-validation results do not count, he responded only, "That's the process. I didn't make up the process." *Id.* at 200:22–201:1. Blanch also cites statements by two of his former team members to support his argument. *See* Decl. Johnson ¶ 11; Decl. Mackay ¶ 19. Yet the opinions of Blanch's team members as to whether the findings should count against Hexagon or constitute grounds to terminate employees does not establish how Hexagon used the findings in evaluating its employees' performance. Indeed, that Hexagon and RMDA employees met on a weekly basis for months prior to the pre-validation, and that work on necessary documentation began eight months prior to the pre-validation, suggests the results were important to Hexagon. Dep. Taylor 168:16–169:3; Def.'s Ex. 13.

Second, Blanch alleges that Hexagon had more preliminary findings in its last audit under DIACAP in 2013 than it did in the 2016 RMF pre-validation. Dep. Blanch 196:20–197:2. But Blanch fails to establish that comparing RMF and DIACAP results in this way is appropriate. Additionally, as Blanch admits, neither McFadden, Hinkle nor Taylor had experience with RMDA's prior accreditation processes using DIACAP, nor does Blanch allege that he—or anyone else—made them aware of the 2013 findings. Dep. Taylor 52:4–8; Dep. Hinkle 119:15–18. Given this, and Blanch's repeated assurances leading up to the pre-validation that things were

under control, it cannot plausibly be alleged that three-year-old results from a different audit process undermines the conclusion that Blanch was failing to perform his job to Hexagon's legitimate satisfaction. Dep. Hinkle 145:16–19; Dep. McFadden 53:3–9; Dep. Taylor 181:10–182:1.

Third, Blanch alleges that prior to his termination, "RMDA told Blanch's team that the pre-[validation] phase findings were not an issue if the findings were addressed before the inspection scheduled for March or April 2017." Pl.'s Opp'n 9. Importantly, Blanch does not allege that RMDA ever communicated this to Hexagon leadership. As such, the information communicated to Blanch's team cannot undermine Hexagon's conclusion that Blanch was failing to perform his job to Hexagon's legitimate satisfaction. Moreover, even if Hexagon leadership had been notified that RMDA said the pre-validation findings would not "be an issue" if they were addressed prior to the final assessment, Hexagon could nonetheless conclude Blanch was failing to meet Hexagon's legitimate expectations because Hexagon believed Blanch had performed subpar work for its client. Indeed, the record—including Blanch's testimony—supports the conclusion that RMDA was extremely displeased with the findings. *See* Dep. Blanch 251:4–10. Accordingly, Blanch fails to raise a genuine dispute of material fact.

Fourth, Blanch contends that the vast majority of findings were minor or expected or involved things Blanch's team could not control. Yet Blanch admits that approximately 200 findings were within his control. And Blanch further admits that Hexagon "[o]bviously" thought there were too many findings and was upset about them. Dep. Blanch at 271:1–272:8. As such, that other findings may not have been within Blanch's control fails to create a genuine dispute of material fact as to whether Blanch was meeting Hexagon's legitimate expectations.

Fifth, Blanch argues that there was plenty of time to correct all of the IT system's

17

vulnerabilities. Yet Blanch fails to establish why Hexagon's ability to correct the 1,052 vulnerabilities identified by the pre-validation renders the existence of those vulnerabilities unproblematic. That Hexagon may have been able to improve its IT system does not cast doubt onto whether Hexagon could find Blanch was failing to meet its expectations because of the poor *current* status of the IT system for which he was responsible. Accordingly, Blanch fails to create a genuine dispute of material fact.

Moreover, Blanch's arguments about the pre-validation findings fail to create a genuine dispute of material fact because it is not Blanch's perception of the pre-validation findings, but rather Hexagon's perception of those findings, that is relevant. "Whether an employee met his employer's legitimate expectations at the time of termination depends on the perception of the decision maker . . . , not the self-assessment of the plaintiff, and not on the opinions of the plaintiff's coworkers." *Arthur v. Pet Dairy*, 593 F. App'x 211, 217 (4th Cir. 2015) (internal quotation marks and citations omitted). Accordingly, considerable doubt exists as to whether Blanch has established the third element of his *prima facie* case of disability discrimination.

Hexagon next argues that Blanch has failed to satisfy the final element of his *prima facie* case, namely that Blanch's discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. Although the Fourth Circuit has characterized the burden of establishing a *prima facie* claim of disability discrimination as "not onerous,"[12] there is nonetheless reason to doubt Blanch has satisfied that requirement here inasmuch as, as Mr. Blanch admits, it is unclear whether McFadden, who made the decision to terminate Blanch, was aware of Blanch's disabilities; Hexagon granted every request Blanch made for medical leave or other disability accommodation; and *no one* at Hexagon *ever* made any negative comments to

---

[12] *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995) (citation omitted).

Blanch about any of his disabilities. Dep. Blanch 109:12–21; Dep. Blanch 105:18–106:18; Def.'s Ex. 52 at 6–7; Dep. Blanch 109:9–11.

Blanch fails to argue that he has satisfied the final element of his *prima facie* case of disability discrimination, namely that his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. Instead, Blanch asserts only, without any citation to supporting authority, that the issue of whether his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination "turn[s], in large measure, on the . . . issue [of] whether Blanch was performing his job at a level that met Hexagon's legitimate expectations." Pl.'s Opp'n 22. This is incorrect. An employee who was meeting his employer's legitimate expectations at the time of his termination may be terminated under a number of circumstances that utterly fail to raise a reasonable inference of unlawful discrimination. For example, an employee may be fired because of corporate restructuring, budget cuts or outsourcing of his job. To raise an inference of unlawful discrimination, "the plaintiff [must] present some . . . affirmative evidence that disability was a determining factor in the employer's decision." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 59 (4th Cir. 1995). "While the burden is not onerous, it is also not empty or perfunctory. Plaintiff's evidence must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law." *Id.* Looking elsewhere in in Blanch's Opposition, he contends that Hinkle grumbled about his lack of availability when he was on medical leave, was irritated and annoyed with his hearing problems, kept tabs on Blanch and "constantly" asked when he had doctor's appointments scheduled, and made an unwelcome visit to Blanch in the hospital. Dep. Blanch 103:15–20, 120:13–126:5; Decl. Payne ¶ 23–25; Decl. Reyes ¶ 13. Blanch also contends that Hexagon put him on a new schedule that made it

difficult for Blanch to attend his dialysis appointments and Thigpen unnecessarily sought a second doctor's note in an effort to keep Blanch out of work. Dep. Blanch 147:1–148:15, 172:13 – 176:2, 182:6–15. Although many of these contentions are not supported by the record or are otherwise problematic (as detailed below in the pretext discussion), this evidence is assumed, *arguendo*, to be sufficient to establish a *prima facie* case of disability discrimination.

The burden thus shifts under the *McDonnell Douglas* framework to Hexagon to provide a legitimate, nondiscriminatory justification for Blanch's firing. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). Hexagon has satisfied this burden. Specifically, Hexagon maintains that Blanch was terminated by McFadden because of the severe and extensive pre-validation findings. According to Hexagon, " McFadden: (1) believed that the findings demonstrated a significant failure by Blanch to perform his job as IT Lead, (2) was concerned about Hexagon's ability to be awarded the RMDA contract again, the re-bidding of which was coming up a few months after the pre-validation, in light of Hexagon's poor performance on RMF and RMDA's dissatisfaction with Hexagon's work on RMF, and (3) believed that a change in IT leadership was necessary to show RMDA that Hexagon had a strong plan for addressing the findings effectively and in a timely manner." Def.'s Mem. 9. Hexagon has thus satisfied its burden of articulating a legitimate, nondiscriminatory justification for Blanch's termination.

Because Hexagon has articulated a legitimate, nondiscriminatory justification for Blanch's termination, the burden shifts back to Blanch to establish Hexagon's justification is pretext for unlawful discrimination. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 575–76 (4th Cir. 2015). Blanch has failed to establish a material factual dispute. Blanch first contends that the issue of whether he can demonstrate Hexagon's justification is pretextual

"turn[s], in large measure, on . . . whether Blanch was performing his job at a level that met Hexagon's legitimate expectations." Pl.'s Opp'n 22. Blanch cites no authority in support of his assertion. Moreover, the evidence Blanch proffers to show he was meeting Hexagon's legitimate expectations at the time of his discharge fails to establish that Hexagon's proffered justification is false for the same reasons the evidence was found uncompelling above.[13]

Blanch next argues that Hexagon's justification is pretext for discrimination because Hexagon stated, in response to one of Blanch's interrogatories, that RMDA "was further concerned because [Blanch] was unable to report to work for an extended period of time in the winter and early spring of 2016 during this critical period." Pl.'s Ex. 30 at 35. Blanch does not clearly articulate how this statement demonstrates Hexagon's proffered justification that Blanch was fired because of the extensive and severe pre-validation findings is pretext for discrimination. To the extent Blanch argues Hexagon's statement shows Hexagon was concerned with Blanch's inability, due to his disabilities, to report to work and was thus motivated to terminate him because of this inability, this argument fails. Hexagon made this statement in response to Blanch's request that it "[i]dentify and describe any concerns raised to Hexagon about Blanch's performance by any RMDA employee." *Id.* Hexagon's reporting, in response to Blanch's interrogatory, of a concern it received from RMDA about Blanch fails to establish that Hexagon shared this concern, much less that Hexagon terminated Blanch because of his disabilities in response to this concern. Indeed, although Blanch alleges that "it was McFadden's, and Hexagon's, concern that Blanch had taken medical leave during this 'critical period,'" he

---

[13] In addition to the reasons discussed above, Blanch's reliance on his reasonably good performance evaluations is uncompelling at this stage of the analysis because Hexagon based its decision to terminate Blanch not on his performance in prior years, but rather his performance regarding the pre-validation. Blanch "cannot establish pretext by relying on criteria of [his] choosing when the employer based its decision on other grounds." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005).

fails to cite any record evidence in support of this allegation. Pl.'s Mem. 28. To the contrary, McFadden, who made the decision to terminate Blanch, testified that neither he nor anyone else that he was aware of at Hexagon had concerns about whether Blanch might need additional leave time. Dep. McFadden 73:17–22.[14] Accordingly, Blanch's argument fails to establish pretext.

Blanch also attempts to establish pretext by arguing that Hexagon required notes from multiple doctors before allowing Blanch to return to work. This claim is incorrect. Although Thigpen reached out to two of Blanch's doctors requesting information about Blanch's ability to turn to work, only one doctor ever responded. Def.'s Ex. 6 at 25. The evidence is consistent with Hexagon's explanation that Thigpen reached out to a second doctor, Dr. Weinroth, because the information provided by the first doctor, Dr. Scott, about Blanch's ability to return to work contained ambiguities and Dr. Scott did not initially respond to Thigpen's request for clarification. *See* Ex. 41, Ex.43, Ex. 45, Ex. 46. When Dr. Scott ultimately responded and provided clarification, Blanch was allowed to return to work and Thigpen did not follow up with—or ever hear from—Dr. Weinroth. Def.'s Ex. 6 at 25. Although Blanch contends that Thigpen was "looking for a reason to keep [him] out of work," the Fourth Circuit has held that, in assessing pretext under the *McDonnell Douglas* framework, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Williams v. Cereberonics, Inc.,* 871 F.2d 452, 456 (4th Cir. 1989). Because Blanch's bald claim is unsupported by the evidence, it fails to establish pretext.

Blanch also alleges that he received "additional scrutiny, hostility, and pushback"

---

[14] Blanch's contention that McFadden could not identify anyone at RMDA who expressed this concern is equally unsuccessful in establishing pretext. Hexagon has proffered an email from Taylor, RMDA's Chief Information Management Officer responsible for overseeing all IT services, to Hinkle expressing concern about Blanch's extended period of telework. Def.'s Ex. 37.

regarding his requested accommodations prior to his termination, evincing pretext. Pl.'s Opp'n 28. Yet Blanch admits that Hexagon granted *every* request he made for disability leave or other accommodation. Dep. Blanch 105:18–106:18; Def.'s Ex. 52 at 6–7. He further admits that *no one* at Hexagon *ever* made any negative comments to him about any of his disabilities. Dep. Blanch 109:9–11. The specific allegations Blanch makes are either unsupported by the factual record or otherwise uncompelling. First, Blanch takes issue with "the imposed schedule changes that made it difficult for Blanch to have his dialysis treatment." Pl.'s Opp'n 29. Specifically, Blanch complains that "all of a sudden I couldn't come in at 6:00 [A.M.]" because of "core hours." Dep. Blanch 148:17–20. Yet Hexagon has proffered contemporaneous record evidence establishing that RMDA, not Hexagon, required Blanch to adopt and follow a schedule that complied with RMDA's core hours.[15] Def.'s Ex. 60, 33, 51. Hexagon's compliance with its client's requirement that Blanch, the IT Lead, maintain a schedule consistent with RMDA's core hours does not constitute evidence of pretext. Second, Blanch argues that McFadden and Hinkle considered terminating Blanch in April 2016 when he was hospitalized due to his hand because they were unsure if or when he would return to work. This fails to establish pretext because the only evidence Blanch cites does not support his claim. Specifically, Blanch relies only on Hinkle's testimony. Yet Hinkle did not state that she and McFadden considered terminating

---

[15] Blanch's report that Waddell Simpson, an RMDA employee, was unaware of RMDA's new schedule requirements does not undermine this conclusion. *See* Dep. Blanch 148:16–149:18. Waddell's knowledge, or lack thereof, is immaterial because the evidence establishes that Taylor, RMDA's Chief Information Officer, requested and required that Blanch work a specific schedule and that Hexagon ensure he complied with that schedule. *See* Pl.'s Ex. 30 at 184 ("I had confirmed with [Taylor] on Friday that he expected the IT manager to be onsite (M, W, F) 7am–3:30pm and (T, Th) 6:30am–2pm."). Furthermore, Blanch's self-serving account of his interaction with Simpson is inconsistent with the contemporaneous evidence. Specifically, Hinkle emailed McFadden on June 21, 2016, reporting that "I just had a conversation with [Simpson] about the conversation he had on Friday afternoon pertaining to [Blanch's] hours. [ Simpson] reminded [Blanch] of the RMDA core hours (9am to 3pm) which is Agency policy." *Id.* The dispute as to whether Simpson was aware of RMDA's expectations regarding Blanch's schedule is immaterial because Blanch has failed to dispute, with admissible record evidence, the fact that Taylor requested and required Blanch to adopt a schedule that complied with RMDA core hours.

Blanch *because* they were unsure if or when he would return to work. *See* Dep. Hinkle 171:20–174:14. Rather, Hinkle explained that, while Blanch was absent from work because of his hand, it was discovered during a meeting that "we were clearly not where we needed to be [with respect to the RMF documentation]. We had no documentation from the technical team with the security controls. So at that point we began to take measure to put things in place. . . . [W]e were looking at what options do we have to try to Band-Aid where we were at this point before [Blanch] would return back on site." *Id.* at 172:19–173:14. Hinkle further explained that although terminating Blanch "was an option that was on the table, . . . it was not looked at." *Id.* at 173:19–20. Accordingly, Hinkle's testimony is insufficient to establish pretext. Finally, Blanch alleges various conduct by Hinkle that he claims evinces pretext. Specifically, he contends Hinkle made an "unwelcome hospital visit, grumbl[ed] about [Blanch's] lack of availability when he was on medical leave, and [was] irritat[ed] and annoy[ed] with [Blanch's] hearing problem." Pl.'s Opp'n 29. Each of these fails to establish pretext. Blanch claims in his Opposition that Hinkle's hospital visit was unwelcome and not intended to help Blanch. Yet Blanch fails to explain how the visit establishes pretext. Furthermore, Blanch fails to support his allegation with anything except his own uncorroborated opinion testimony. Blanch admits that Hinkle had visited him almost every time he had been hospitalized to bring him FMLA or short-term disability paperwork, and he does not deny that Hinkle brought him short-term disability paperwork during the April 2016 visit he complains about. Dep. Blanch 122:20–123:2; Dep. Hinkle 101:1–102:3. Given this, Hinkle's April 2016 hospital visit fails to evince pretext. Blanch's claims that Hinkle grumbled about his lack of availability while he was on medical leave and was irritated and annoyed with his hearing difficulties are equally unsuccessful in establishing pretext. Blanch's claim that Hinkle grumbled about his lack of availability is

supported only by a hearsay affidavit from Gabriel Reyes, one of Blanch's former supervisees, asserting that Reyes heard as much from coworkers. Reyes Aff. ¶ 13. Notably, Blanch fails to provide testimony from these coworkers or even identify them. Blanch provides somewhat more support for his claim that Hinkle was irritated and annoyed by his hearing problem. Specifically, he cites his own testimony and the affidavit of a supervisee who attests that she witnessed Hinkle act "annoyed" that Blanch could not hear well in meetings. Dep. Blanch 13:14–104:4; Payne Aff. ¶¶ 26–27. Yet Hinkle's annoyance when Blanch could not hear during meetings is insufficient to establish pretext given the overwhelming evidence supporting Hexagon's asserted justification. Moreover, Hinkle's conduct fails to establish Hexagon's justification for firing Blanch is pretextual because it was McFadden, and not Hinkle, who made the decision to terminate Blanch. Dep. McFadden 66:5–67:14; Dep. Hinkle 148:3–5; 178:1–14. Indeed, although Blanch alleges Hinkle was involved in the termination decision, he cites no persuasive record evidence in support of his claim. Rather, Blanch admits that he merely suspects Hinkle was involved in the decision because "she's [his] manager." Dep. Blanch 101:9–15. Such "rank speculation" is plainly insufficient to create a genuine dispute of material fact. *See Jiminez v. Mary Washington College*, 57 F.3d 369, 380 (4th Cir. 1995) (dismissing letters and testimony as "rank speculation" and concluding they were "far too insubstantial" to give rise to an inference of discrimination). Furthermore, both McFadden and Hinkle testified that Hinkle was not involved in the decision to terminate Blanch; McFadden informed Hinkle of Blanch's imminent termination only after the decision had been made. Dep. McFadden 66:5–67:14; Dep. Hinkle 148:3–5; 178:1–14. Accordingly, Blanch's argument that Hinkle's actions evince pretext is unpersuasive because it was McFadden, and not Hinkle, who made the decision to terminate Blanch.

Finally, Blanch argues that the inference of pretext is "made even stronger by the evidence of Blanch's escalating medical challenges . . . and accommodation needs." Pl.'s Opp'n 28. This argument makes no sense. Hexagon continually accommodated Blanch's medical issues. Dep. Blanch 105:18–106:18; Def.'s Ex. 52 at 6–7. And Blanch's other arguments fail to create the inference of pretext that he refers to. As Blanch has failed to introduce persuasive affirmative evidence of pretext, the mere fact that Blanch's medical challenges escalated during his employment is plainly insufficient to establish pretext. *See Giannopoulous v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 411 (4th Cir. 1997) ("If the evidence does not amply support plaintiff's claim that the defendant's explanation is unworthy of credence, judgment as a matter of law is entirely appropriate.").

Accordingly, Blanch has failed to establish Hexagon's proffered justification for terminating Blanch's employment is pretext for discrimination. Accordingly, Blanch's ADA discriminatory discharge claim fails as a matter of law.

### B.

Blanch next alleges retaliation in violation of the ADA. As with a discriminatory discharge claim under the ADA, a retaliation claim under the ADA may be proven through direct evidence or the *McDonnell Douglas* burden-shifting framework. *Rhoads v. F.D.I.C.,* 257 F.3d 373, 392 (4th Cir. 2016). Because Blanch does not proffer direct evidence of retaliation, the *McDonnell Douglas* framework detailed above applies. Under this framework, "to establish a prima facie case of retaliation, a plaintiff must show that (1) [he] is engaged in a protected activity; (2) [his] employer acted adversely against [him]; and (3) [his] protected activity was causally connected to [his] employer's adverse action." *Id.*

There is no dispute that Blanch was engaged in protected activity and Hexagon acted

adversely against him. Def.'s Mem. 23–24. The dispute focuses on the third element of Blanch's *prima facie* case, namely the causal nexus requirement, and whether Hexagon's proffered legitimate, nonretaliatory justification for terminating Blanch is pretextual.

The Fourth Circuit has recognized that mere temporal proximity between plaintiff's request for accommodation and termination is sufficient to establish a *prima facie* case of ADA retaliation. *Haulbrook v. Michelin North America*, 252 F.3d 696, 706 (4th Cir. 2001). Although Blanch's April 2016 request for a teleworking arrangement was close in time to his June 30, 2016 termination, his claimed protected activity extends back to 2012, undermining the inference of retaliation. Yet even assuming Blanch can establish a *prima facie* case of ADA retaliation, his claim nonetheless fails because, for the reasons discussed above, Blanch cannot establish that Hexagon's proffered justification for terminating Blanch is pretextual.[16] As such, Blanch's ADA retaliation claim fails as a matter of law.

## C.

Finally, Blanch claims retaliation in violation of the FMLA. The FMLA makes it unlawful for "any employer to discharge or in any manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Like Blanch's other claims, a retaliation claim under the FMLA may be proven "by direct evidence of retaliation or through the familiar burden shifting framework articulated in *McDonnell Douglas*." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016).

---

[16] In addition to the arguments discussed above, Blanch argues that the temporal proximity between his April 2016 ADA-protected activity and his June 2016 termination allows an inference that Hexagon's justification for terminating Blanch is pretextual and the true reason is retaliation. His argument is unsuccessful. Blanch contends that his ADA-protected activity is not only his April 2016 request for telework, but also all of his use of medical leave and telework dating back to 2012. Given this, Blanch's temporal proximity argument is weak; his protected activity began in 2012, and yet he was not fired until 2016. Furthermore, the Fourth Circuit has maintained that, although temporal proximity may be sufficient to establish a *prima facie* case of retaliatory discharge, it "far from conclusively establishes the requisite causal connection." *Williams v. Cerberonics, Inc.*, 871 F.2d 542, 457 (4th Cir. 1989).

To establish a *prima facie* claim for FMLA "retaliation, a plaintiff must show [i] that he engaged in protected activity, [ii] that the employer took adverse action against him, and [iii] that the adverse action was causally connected to plaintiff's protected activity." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (internal quotation marks and citations omitted).

Hexagon assumes for the purposes of summary judgment that Blanch can establish a *prima facie* case of FMLA retaliation because of the temporal proximity between his April 5, 2016 hospitalization and his June 30, 2016 termination. Def.'s Mem. 25 n.7. Yet Blanch's FMLA claim nonetheless fails because, for the reasons discussed above, he cannot establish that Hexagon's legitimate, nonretaliatory justification is pretextual. Accordingly, Blanch's FMLA retaliation claim fails as a matter of law.

## IV.

There is no doubt, and Hexagon does not dispute, that Blanch suffers from a number of physical impairments. However, the record does not disclose a triable issue of fact as to Hexagon's legitimate, nondiscriminatory and nonretaliatory reason for terminating Blanch.

Accordingly, and for the reasons discussed above, Hexagon's Motion for Summary Judgment must be granted. Because Hexagon's Motion for Summary Judgment must be granted, it is not necessary to reach the question of whether Blanch is entitled to summary judgment with respect to Hexagon's statute of limitations defense.

An appropriate Order will issue.


Alexandria, Virginia
October 15, 2018

/s/

T. S. Ellis, III
United States District Judge

28